UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

SHEILA HOLLINGS,                )
                                )
    Plaintiff,                  )
                                )
vs.                             )   CASE NO. 2:11-CV-0375-SLB
                                )
NOLAND HEALTH SERVICES, INC.,   )
                                )
    Defendant.                  )

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment. (Doc. 16.)[1] Plaintiff Sheila Hollings has sued her former employer, defendant Noland Health Services, alleging that defendant discriminated against her on the basis of her race and that it retaliated against her for complaining about discrimination. Upon consideration of the record, defendant's submissions, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment, (doc. 16), is due to be granted.

### I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference."

*Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Plaintiff did not file any response to defendant's Motion for Summary Judgment. The Eleventh Circuit has held, "Where 'the adverse party does not respond, summary judgment, ***if appropriate***, shall be entered against the adverse party.' Thus, summary judgment, even when unopposed, can only be entered when 'appropriate.'" *United States v. One Piece of Real Property*, 363 F.3d 1099, 1101 (11th Cir. 2004)(quoting Fed. R. Civ. P. 56(e))(emphasis in original).

## II. STATEMENT OF FACTS

The following facts are set forth in defendant's Brief in Support of its Motion for Summary Judgment. (Doc. 17 at 4-12.)[2]  Plaintiff did not dispute these facts, which are supported by the record evidence submitted by defendant. Therefore, these facts are deemed admitted.[3]

---

[2]Citations to page numbers in defendant's Brief in Support of its Motion for Summary Judgment, (doc. 17), and its Evidentiary Submission in Support of Motion for Summary Judgment, (docs. 18-1 to 18-6), except for plaintiff's deposition, (doc. 18-2), refer to the page number assigned to the document in the court's electronic filing system. Citations to plaintiff's deposition, (doc. 18-2), refer to the page number in the deposition transcript.

[3]Exhibit A to the Scheduling Order states, "All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes

1.  Noland Health Services ("NHS"), Defendant in the above-styled action, [footnote] is an Alabama Corporation operating full service senior living facilities and long-term acute care hospitals across the state. [(Doc. 18-1 ¶ 1)].

[Footnote:]  Incorrectly named as Noland Health Services, Inc., in Plaintiff's Amended Complaint.

2.  Through its Hospital Division, NHS operates long-term acute-care hospitals in Anniston, Birmingham, Dothan, Montgomery, Shelby County, and Tuscaloosa, Alabama.  [(*Id*. ¶ 9.)]

3.  Noland Hospital Birmingham ("NHB") is located on the eighth floor of St. Vincent's Hospital East.  [(*Id*. ¶ 10.)]

4.  Plaintiff worked at NHB as a Registered Nurse ("RN") on the 7:00 pm - 7:00 am shift on an as-needed, fill-in ("PRN") basis.  [(Doc. 18-2 at 12, 99.)]

5.  As a PRN employee, Plaintiff had a higher rate of pay than full-time employees.  [(*Id*. at 178.)]

6.  Also, by working from 7:00 pm-7:00 am, Plaintiff received a shift differential of $2-$5 an hour.  [(*Id*. at 99-100.)]

7.  Plaintiff never heard derogatory comments about black people in the workplace.  [(*Id*. at 175.)]

8.  Plaintiff never heard a derogatory comment about people who had filed EEOC Charges or whistleblowers while working for NHS.  [(*Id*. at 176.)]

9.  As of November 2009, NHS employees desiring to transfer to another facility were required to submit a transfer request form, not an application for employment.  [(*Id*. at 110, 123; doc. 18-1 ¶ 17.)]

---

unless controverted by the response of the party opposing summary judgment."  (Doc. 9-1 at 4 [emphasis omitted].)

10. The transfer request process was described in NHS's policies, readily available to employees. [(Doc. 18-1 ¶ 19; doc. 18-3 at 4-5.)]

11. According to the transfer policy, an employee wishing to transfer to another facility works with her current supervisor to facilitate a transfer if she is eligible and qualified. [(Doc. 18-1 ¶ 20 and pp. 10-11.)]

12. Plaintiff did not look for instructions on how to seek a transfer of her employment to another facility. [(Doc. 18-2 at 104.)]

13. While still employed at NHB, on or about November 3, 2009, Plaintiff completed a regular, new employee application for a full-time RN position at Noland Hospital Tuscaloosa (NHT). [(Doc. 18-3 at 6-10.)]

14. Applying as a new employee was not proper under the transfer policy. [(Doc. 18-1 ¶ 22.)]

15. At this time, NHT's Nurse Manager was Denise Robertson. As Nurse Manager, Robertson had primary responsibility for hiring nursing staff and analyzing staffing needs. [(*Id*. ¶¶ 16, 30; doc. 18-4 ¶¶ 7-19; doc. 18-5 ¶¶ 8-10.)]

16. Having received no response to her improper application, Plaintiff contacted Robertson on or about December 7, 2009, resulting in NHB providing her a transfer request that day. [(Doc. 18-1 ¶ 23 and p. 13; doc. 18-2 at 14-15.)]

17. Plaintiff completed the transfer request form around December 13, 2009. [(Doc. 18-3 at 11.)]

18. NHB's Nurse Manager, Melissa Austin, promptly signed Plaintiff's transfer request on December 13 or 14, 2009. [(Doc. 18-1 ¶ 15; doc. 18-2 at 17-18; doc. 18-3 at 11.)]

19. Plaintiff's transfer request was submitted to Robertson, NHT's Nurse Manager, on or about December 16, 2009. [(Doc. 18-4 at 7-8, 10.)]

20. In between December 7, 2009, and December 16, 2009, on December 9, NHT had hired another full-time registered nurse for the 7:00 pm - 7:00 am shift. [(Doc. 18-1 ¶ 38.)]

21. Robertson reviewed NHT's patient census and current staff, and determined that NHT did not need to hire a full-time RN at that time. [(Doc. 18-5 ¶ 13 and p. 7.)]

22. Robertson reached this decision on her own; no one told her not to hire Hollings. [(*Id*. ¶¶ 13, 16-17; doc. 18-4 ¶¶ 15-16.)]

23. Robertson's supervisors did not know Plaintiff's race or that Plaintiff had filed an EEOC Charge against NHS. [(Doc. 18-4 ¶¶ 13-14; doc. 18-5 ¶¶ 14-15.)

24. NHT's Administrator did not even know that Hollings had completed a transfer request prior to Robertson reaching her decision. [(Doc. 18-5 ¶ 13.)]

25. Robertson, like Plaintiff, is a black female. [(*Id*. ¶ 8.)]

26. Robertson never interviewed Plaintiff for a position. [(Doc. 18-2 at 122-23.)]

27. Plaintiff and Robertson never discussed pay. [(*Id*. at 179.)]

28. Plaintiff and Robertson had only discussed NHT's and NHB's relative patient acuity by phone. [(*Id*. at 122.)]

29. In fact, the only basis Hollings has to believe that there was an opening around this time is her conversation with Happiness Deason, in which Deason stated that NHT needed more night shift RNs. [(*Id*. at 116.)]

30. In 2009 and 2010, Deason was a full-time weekend RN, working both days and nights over the weekend at NHT. [(Doc. 18-1 ¶ 31; doc. 18-4 ¶ 21; doc. 18-5 ¶ 22.)]

31. Deason was not a managerial employee; she did not have hiring authority at NHT. [(Doc. 18-1 ¶ 32; doc. 18-4 ¶ 22; doc. 18-5 ¶ 23.)]

32. Deason was not responsible for recruiting RNs to NHT. [(Doc. 18-1 ¶ 33; doc. 18-4 ¶¶ 23-24; doc. 18-5 ¶¶ 24-25.)]

33. Plaintiff signed her first Charge on July 12, 2009.  [(Doc. 18-2 at 136-37.)]

34. Plaintiff first saw a stuffed animal monkey doll about February 26, 2010, approximately seven months after Plaintiff filed her first Charge with the EEOC.  [(*Id.*)]

35. Plaintiff saw the doll only one time.  [(*Id.* at 142.)]

36. The doll was a slim, brown monkey.  [(*Id.* at 141.)]

37. The doll wore a blue pinafore or shirt.  [(*Id.* at 141, 144.)]

38. When Plaintiff saw the doll, it was sitting on a shelf in Austin's office.  [(*Id.* at 141, 143.)]

39. Austin did not draw Plaintiff's attention to the doll.  [(*Id.* at 165.)]

40. The doll was a promotional item from Ruhof Corporation . . .; NHS's Hospital Division's Director of Infection Control [Beverly Vickery] received it at a national conference on infection control and then gave it to Austin.  [(Doc. 18-6 ¶¶ 14-15 and p. 14.)]

41. The back of the monkey's shirt reads, "Cleaning Surgical Instruments is [~~Monkey~~] Serious Business.  Ruhof."  [(*Id.* at p. 14.)]

42. The doll did not disrupt Plaintiff's work; it did not make her cry.  [(Doc. 18-2 at 189.)]

43. No one told Plaintiff the doll was intended to retaliate against her.  [(*Id.* at 149-50.)]

44. Plaintiff has no basis to believe the doll was displayed to retaliate against her for filing an EEOC Charge except for the fact that it was displayed seven months after she filed the Charge.  [(*Id.* at 137-40.)]

45. Plaintiff believes that Austin may have displayed the doll to retaliate against Plaintiff for calling NHS's corporate office to complain about disciplinary actions in April 2009.  [(*Id.* at 138-40.)]

46. In this call to NHS's corporate office, Plaintiff did not contend that Austin took those disciplinary actions because of her race. [(*Id*. at 139.)]

47. No one ever called Plaintiff a monkey and she has no basis to believe the monkey was related to her race except for historical use of the term as a racial pejorative. [(*Id*. at 146-47.)]

48. No one ever told Plaintiff the monkey doll was intended to depict black nurses generally. [(*Id*. at 150.)]

49. Plaintiff subjectively believes that monkeys are "not positive." [(*Id*. at 146, 150 ["It was nothing positive, in my opinion, nobody else's."].)]

50. Plaintiff agreed that reasonable people, regardless of race, could interpret the monkey doll differently. [(*Id*. at 172-73.)]

51. NHS has policies prohibiting discrimination, harassment, and retaliation. These policies are communicated to its employees in its Employee Handbook, among other places. [(Doc. 18-1 ¶ 34 and p. 24; doc. 18-3 at 23.)

52. Plaintiff received this Employee Handbook. [(Doc. 18-2 at 173-74.)]

53. However, Plaintiff did not look up the policy. [(*Id*. at 170, 174.)]

54. Even if she had looked up the policy, Plaintiff would not have followed the complaint reporting procedure. [(*Id*. at 170.)]

55. These policies informed Plaintiff how to report complaints of discrimination, harassment, retaliation, or other suspected violations of the law or NHS's policies. [(Doc. 18-1 ¶ 36.)]

56. The policies indicate that this conduct can be reported to the facility's Administrator or Vice President of Human Resources. [(*Id*. ¶ 37.)]

57. Plaintiff's second Charge of Discrimination to the EEOC, regarding the monkey doll, was sent to the EEOC by Plaintiff around April 16, 2010. [(Doc. 18-2 at 102; doc. 18-3 at 2-3.)]

  58. Other than this Charge, Plaintiff never complained about the doll. [(Doc. 18-2 at 168, 170.)]

  59. Plaintiff's only reason for not bringing this concern to the individuals designated in NHS's policy to receive complaints of discrimination, harassment, or retaliation was the she was not a regular worker and that she could not be troubled to use e-mail or voice[-]mail to communicate with those who could receive complaints. [(*Id*. at 170.)]

  60. Although it did not find a basis to believe the doll was discriminatory, harassing, or retaliatory, NHS ordered Austin to remove the doll. [(Doc. 18-6 ¶¶ 15-16.)]

  61. Austin removed the doll. [(*Id*. ¶ 17; doc. 18-2 at 174-75 [does not know if doll was removed].)]

(Doc. 17 at 4-12.)

## III. DISCUSSION

Plaintiff's claims are based on two alleged adverse employment actions: (1) failure to transfer her to the Tuscaloosa facility, and (2) hostile work environment. For the reasons set forth below, defendant's Motion for Summary Judgment is due to be granted.

**A. FAILURE TO TRANSFER**

Plaintiff alleges that defendant failed to transfer her to its Tuscaloosa facility based on her race, African-American, and in retaliation for filing an EEOC charge.

  To establish a prima facie case of a failure to promote/transfer, a Title VII or § 1981 plaintiff must show the following:

> 1) that she belongs to a protected class; (2) that she was qualified for a job ***for which the employer was seeking applicants***; 3) that, despite her qualifications, she was rejected; and 4) that, after her rejection, the employer continued to seek applicants or filled the position with a person outside of the plaintiff's protected group.

9

>   *Gaddis v. Russell Corp.*, 242 F. Supp. 2d 1123, 1135 (M.D. Ala. 2003)
>   (Albritton, J.)(citing *Walker v. Mortham*, 158 F.3d 1177, 1186 (11th Cir.
>   1998), *cert. denied*, 528 U.S. 809, 120 S. Ct. 39, 145 L. Ed. 2d 36 (1999);
>   *Williams v. Ala. Indus. Dev. Training*, 146 F. Supp. 2d 1214, 1219 (M.D. Ala.
>   2001)(De Ment, J.)).

*Freeman v. Koch Foods of Alabama*, 777 F. Supp. 2d 1264, 1282 (M.D. Ala. 2011). A plaintiff alleging she was wrongfully denied a promotion or transfer must establish, at a minimum, that the desired position was available. "If there never was a job, it would be inappropriate to allow suits against the employer for wrongful rejection. Every member of every protected class would have a right to a job of his or her choice, regardless of whether or not there is a job to be had." *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1239 n.19 (11th Cir. 2000); *see, e.g.*, *Austin v. Progressive RSC, Inc.*, 265 Fed. Appx. 836, 842 (11th Cir. 2008)("First, a CSOA III position did not exist at the Riverview facility, and the absence of an available position was fatal to Austin's claim."); *Jones v. Firestone Tire and Rubber Co., Inc.*, 977 F.2d 527, 533-34 (11th Cir. 1992)("Jones did not have a Title VII claim with regard to market-level jobs because no market-level jobs were available in the Metro–Market Zone.").

Because plaintiff has not rebutted defendant's showing that it did not have an available position at its Tuscaloosa facility, defendant's Motion for Summary Judgment will be granted and plaintiff's claims based on defendant's failure to transfer her to Tuscaloosa will be dismissed.

**B. HOSTILE WORK ENVIRONMENT**

"When the workplace is permeated with discriminatory [or retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998).

> An employer is therefore liable to an employee for a racially hostile work environment under both statutes if the employee proves that:
>
> > (1) [she] belongs to a protected group; (2) [she] was subjected to unwelcome harassment; (3) the harassment was based on [her] membership in the protected group; (4) it was severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment; and (5) the employer is responsible for that environment under a theory of either vicarious or direct liability.

*Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012)(quoting *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300 (11th Cir. 2010)); *see also Tucker v. Benteler Automotive AL, Inc.*, Civil Action No. 3:07cv298–WHA, 2009 WL 531875, *13 (M.D. Ala. Mar. 3, 2009)(setting forth the elements of a retaliatory hostile work environment claim).

Plaintiff's hostile work environment claim is based on a monkey-doll she saw sitting on a shelf in her supervisor's office. The Eleventh Circuit has recognized that monkey imagery and name-calling can be "part of actionable racial harassment." *See Jones*, 683 F.3d at 1297 (quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F.3d 903, 911 (8th Cir. 2006); citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1269 (11th Cir. 2008); *Walker v. Thompson*, 214 F.3d 615, 626 (5th Cir. 2000), *abrogated on other grounds by*

11

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). "'Given the history of racial stereotypes against African-Americans and the prevalent one of African-Americans as animals or monkeys, it is a reasonable – perhaps even an obvious – conclusion that' the use of monkey imagery is intended as a 'racial insult' where no benign explanation for the imagery appears.'" *Id*. (quoting *United States v. Jones*, 159 F.3d 969, 977 (6th Cir. 1998); citing *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647-48 (7th Cir. 2011)).

      However, even assuming the monkey-doll on a shelf in her supervisor's office was insulting and disconcerting to plaintiff, the record is undisputed that the one-time encounter with the monkey-doll was neither sufficiently severe nor pervasive "to alter the terms and conditions of employment and create a hostile or abusive working environment." *See id*. at 1292. Plaintiff saw the monkey-doll one time, and she did not "pay that close attention" to it. (Doc. 18-2 at 141-42, 143-44.) Also, she testified that the monkey-doll did not disrupt her work. (*Id*. at 189.) Because plaintiff did not respond to defendant's Motion for Summary Judgment, she has not rebutted defendant's showing that the one-time encounter with the monkey-doll was not harassment so severe as to alter the terms and conditions of plaintiff's employment.

      Therefore, defendant's Motion for Summary Judgment will be granted and plaintiff's claims based on harassment will be dismissed.

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An Order granting defendant's Motion for Summary Judgment, (doc. 16), will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 11th day of March, 2013.

_Sharon Lovelace Blackburn_
SHARON LOVELACE BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE